IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SHANE ROBERT HALL,

                                OPINION AND ORDER

                Plaintiff,

                                15-cv-107-bbc

       v.

CAROLYN COLVIN,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This is an appeal of an adverse decision of the Commissioner of Social Security brought pursuant to 42 U.S.C. § 405(g).  Plaintiff Shane Robert Hall contests the commissioner's May 2013 decision denying his claim for disability benefits and supplemental security income under the Social Security Act.  This is plaintiff's second time before this court on this claim.  In 2012, I granted a motion by the commissioner to remand the case to the agency for further development of the record.  Specifically, the case was remanded to allow plaintiff's father to testify and to develop the medical record concerning plaintiff's alleged mental impairments.

The record now before the court shows that plaintiff's claim was assigned to a new administrative law judge, who sent a medical release form to plaintiff so that she could obtain his updated medical records.  However, plaintiff refused to sign the form.  In addition, although plaintiff appeared at the hearing with counsel, he declined to call his

father to testify.  After a videoconferenced hearing at which plaintiff, a consultative medical examiner and a vocational expert testified, the administrative law judge issued a decision finding plaintiff not disabled.  Specifically, the administrative law judge found that although plaintiff has the severe impairments of anxiety disorder, not otherwise specified, history of polysubstance abuse, and history of psychotic disorder, not otherwise specified, he does not have limitations that prevent him from performing unskilled work with no more than routine interactions in the work setting, and therefore he is capable of performing thousands of jobs in the national economy.

Plaintiff, who is now representing himself, argues that the commissioner's decision should be reversed because the hearing room was too cold, he could not see the administrative law judge clearly on the video screen and the judge was intolerant, discriminatory and would not allow communication between plaintiff and his lawyer. Because none of these claims is substantiated by the record or had any bearing on the outcome of plaintiff's claim, none can qualify as a basis for reversing the commissioner's decision.  Moreover, having conducted my own review of the record and the administrative law judge's decision, I am satisfied that it is supported by substantial evidence.  Accordingly, it will be affirmed.

## I.  FACTS

### A.  <u>Background</u>

Plaintiff was born on June 18, 1976, making him 27 on his alleged disability onset date of April 1, 2004.  He has a high school education and worked full time as a corrections officer for approximately one year in 2003-2004.  Other than that one year of employment, plaintiff has worked little, except for a few other short-term jobs such as car parts delivery driver and waiter.

Plaintiff applied for disability insurance benefits and supplemental security income on April 10, 2008, alleging that he was disabled as of April 1, 2004 from a learning disability and "psychosis-depression."  AR 169-70.  His claim was eventually heard by an administrative law judge, who, in a decision dated July 21, 2010, found that plaintiff was not disabled and therefore not entitled to benefits under the Social Security Act.  AR 8-20.

As noted above, plaintiff eventually appealed that decision to this court, and obtained a remand for the purpose of further developing the record.  AR 412-24; <u>Hall v. Astrue</u>, 11-cv-615-bbc (W.D. Wis.), dkt. # 15.  Plaintiff's case was assigned to a new administrative law judge, Teresa Hoskins-Hart, who held a hearing on March 5, 2013.  Plaintiff appeared, with counsel, via videoconference.  Also appearing were Dr. Robert J. McDevitt, an impartial medical expert, and Michael J. Guckenberg, an impartial vocational expert.  On May 17, 2013, Hoskins-Hart issued a decision denying plaintiff's application.  On January 15, 2015, the Appeals Council denied plaintiff's request for review, making Hoskins-Hart's decision the final decision of the commissioner for purposes of judicial review.  AR 273-75.

B.  <u>Medical Evidence</u>

1.  <u>2003-2004</u>

Plaintiff was treated for tonsilitis in early 2003, while he was in police academy training for the Arizona Department of Correction.  On September 4, 2003, plaintiff was prescribed Triavil after reporting that he felt depressed.  A week later, he reported that he had had a "medical episode" during which he passed out in the drive-through at a Jack in the Box restaurant after drinking a few beers.  AR 219.  On September 18, 2003, it was noted that plaintiff's fatigue and depression were much better with the Triavil.  AR 220.

On January 23, 2004, plaintiff reported to his doctor that he had been advised by an emergency room doctor to try Wellbutrin for smoking cessation.  Plaintiff wanted to continue Triavil, although he was advised to stop the Triavil if he wanted to try the Wellbutrin.  Plaintiff was given samples of Wellbutrin and told that if he wished to take both medications, he would have to be seen by a psychiatrist for re-evaluation and definitive care.

2.  <u>2006-2007</u>

a.  Colorado West Mental Health

The next evidence of any medical treatment is from February 21, 2006, when plaintiff was admitted to the observation unit at the Colorado West Regional Mental Health Center with a diagnosis of possible psychosis.  He was brought there after his brother called the police, reporting that plaintiff was acting in a strange manner and seemed delusional.

4

Admitting staff noted that plaintiff appeared to have visual hallucinations and a delusionary process; he was noted to have declared that it was June and that we "are all children of God." Plaintiff was given an anti-psychotic medication, which calmed him.  He slept through the night.

In the morning, plaintiff was seen by Dr. Lowell Stratton, a psychiatrist.  Dr. Stratton attempted to get a history from plaintiff, but plaintiff had difficulty answering the questions and eventually said he did not want to talk further unless his father was present.  Later that day, plaintiff's father came to the unit and he and plaintiff met with Dr. Stratton.  Plaintiff's father stated that he did not like or trust psychiatry and that he would answer questions for his son.  He reported that the family had just moved to Colorado ten days earlier, that plaintiff had not been eating or sleeping much for six weeks and that plaintiff seemed much better that day than he had been before his hospital admission.  He said that in the past six weeks, plaintiff had been pacing a lot and talking to himself as if there were another person in the room, but he made no threats or suggestions of harmful behavior.  In addition, he said, in the week before admission, plaintiff had not been able to sleep at all.

Plaintiff and his father denied that plaintiff had had any developmental disability or learning disability and said he got average grades.  With respect to drugs and alcohol, plaintiff said he used to drink until three years ago and that he had used crystal meth twice in the last ten days, two days before he went for a week without sleep.  Plaintiff said that in the past he might have been told that he used cocaine, but he was not sure that he had; he also admitted some marijuana use.  At that point in the interview, plaintiff's father

5

interjected and said he thought plaintiff had not spent more than $200 in the past year for drugs.

On mental status evaluation, Dr. Stratton noted that plaintiff was "certainly unusual" and exhibited odd behavior. He noted that plaintiff was guarded and cautious and seemed befuddled by questions that should not have been confusing. His thought content was vague, evasive and "empty of any meaningful themes that one would expect of a 29-year-old" which caused Dr. Stratton to wonder about plaintiff's cognitive functioning. However, plaintiff's father said there was nothing wrong with his son, he was much better than he had been the night before and he wanted him to go home. Although Dr. Stratton suspected that plaintiff's father was not being straightforward about plaintiff's functioning, Stratton saw no evidence that plaintiff was homicidal or suicidal or gravely disabled, so he discharged him. Plaintiff was sent home with a followup for an outpatient appointment, but he did not go. He was not prescribed any medication because he refused any prescription. At discharge, Stratton's diagnosis was substance-induced psychosis.

b.  St. Croix Regional Medical Center

On September 9, 2007, plaintiff visited the urgent care clinic in northern Wisconsin, stating that he had awoken during the night with shortness of breath, wheezing and leg cramps. On examination, he was noted to be anxious but otherwise normal. His diagnosis was mild reactive airway disease and a "strong component" of anxiety. He was prescribed albuterol for reactive airway and Lorazepam (an anti-anxiety medication) and told to stop

smoking and establish a primary care doctor for follow up care.  AR 230.

3.  <u>2008-2009</u>

a.  Evaluation by Kyla King

On June 10, 2008, plaintiff underwent a consultative mental status evaluation with Kyla King, a licensed psychologist in Menomonie, Wisconsin, upon the referral of the Wisconsin disability determination bureau.  AR 231-36.  Plaintiff told King that he was applying for social security disability because of a "learning disability" in math that had hindered him in obtaining employment.  According to plaintiff, he had been in a learning-disabled math class when he was in school.  He denied that he had any diagnosed or undiagnosed medical problems or any problems with drugs or alcohol.  Although he admitted using alcohol about once a month, he said he had never become intoxicated and he denied using cannabis, cocaine, amphetamines or other drugs.

Plaintiff said that the longest period he had worked continuously was one year in corrections.  He told King that he resigned in late 2003 or early 2004 because he "felt he could not do the job."  He had not held a job since that time.  When asked what type of work he thought he could do now, plaintiff replied, "To be honest, I don't think I could do today's jobs."  At best, he said, he could be a full-time general laborer.

Plaintiff reported having a close relationship with his father and his two brothers; at the time of the examination, plaintiff was living with his older brother.  He reported limited activities because of a lack of finances; according to plaintiff, he and his family were "dirt

poor." He said his typical day consisted of rising at 5 to 6 a.m., doing some chores such as laundry or cooking, socializing with family and little else. He showered every day and brushed his teeth once or twice a day. He went to bed about 7 or 8 p.m.

Plaintiff's mental status evaluation was largely normal. He maintained good eye contact, was cooperative and interacted and engaged with King appropriately. His affect was congruent with his mood, which was euthymic. His speech was normal in rate, rhythm and tone and his motor activity was unremarkable. He was oriented to person, place, time and situation and did not appear to have deficits in encoding or long-term memory. His short-term memory was fair, with plaintiff able to repeat four words twice after one presentation and able to recall three of the four words after a brief time period. He was able to spell "world" correctly both forwards and backwards quite quickly and did not appear to have impaired comprehension. However, he had difficulties with abstract reasoning and similarities.

In her summary, King noted that although plaintiff was referred for a mental status evaluation to determine difficulties with depression, he did not report any symptoms of depression. He did say that he had problems with anxiety, although King detected no overt symptoms of anxiety and plaintiff did not describe any. His main alleged problem was a learning disability in math, but plaintiff could not explain how this reported problem had affected his ability to maintain employment. In King's opinion, plaintiff had not been honest about his past or current drug use and his lack of honesty made it difficult to assess his personality style and would impair any progress he could make. Assessing his ability to

8

work, King concluded that plaintiff would have no difficulties understanding, remembering or carrying out instructions, maintaining concentration, withstanding routine work stress or change or responding appropriately to supervisors or co-workers.

b.  State medical consultants

On August 4, 2008, Eric Edelman, Ph. D., a consultant for the Wisconsin local disability office, reviewed plaintiff's file and determined that although there was evidence suggesting that plaintiff had an anxiety-related disorder and a substance addiction disorder, the impairments were not severe.  Assessing plaintiff's functional limitations, Edelman found that plaintiff would have only mild difficulty in activities of daily living and concentration, persistence or pace, no difficulties in maintaining social functioning and that he had had one or two episodes of decompensation.  AR 238-48.  On November 17, 2008, a second consultant, Roger Rattan, Ph. D., reviewed the record and reached essentially the same conclusions as Edelman, finding that plaintiff did not have a severe mental impairment.  AR 252-64.

c.  Free Clinic of Pierce and St. Croix Counties

On December 9, 2008, plaintiff saw Dr. David Wilhelm.  He reported a long history of depression, anxiety and obsessive-compulsive disorder, but said he was untreated because he is uninsured.  Plaintiff's answers to a questionnaire provided by Dr. Wilhelm suggested that he was depressed.  On examination, plaintiff was alert and oriented, with normal recall,

insight, judgment, fund of knowledge, speech, and vocabulary and no evidence of psychosis. Dr. Wilhelm diagnosed depression, anxiety and probable OCD and prescribed paroxetine, an anti-depressant.

Plaintiff was not seen again until May 26, 2009. He reported that he did not think the paroxetine was working well and asked to switch to a different medication. Dr. Wilhelm switched the prescription to sertraline 100 mg daily and referred him to St. Croix County Psychiatric Services.

On October 20, 2009, plaintiff was seen for a scheduled office visit by John Dinnies, a physician's assistant. AR 504-06. Although plaintiff had scheduled the appointment to be seen for a persistent cold, at the visit he brought in a form that he asked Dinnies to complete regarding his claim for social security benefits based on his reported "depression, OCD and ADD." Plaintiff, who was accompanied by his father, also asked Dinnies to refill all of his medicines, stating that he had recently qualified for Badger Care medical insurance. Plaintiff said that in the past he had been on Adderall XR, diazepam (Valium) and Zoloft (paroxetine) but did not like the Zoloft. Dinnies declined plaintiff's refill request and referred him to the mental health unit.

4.  2010-2011

a.  St. Croix County Department of Health and Human Services

On March 30, 2010, plaintiff saw David Huebsch, a mental health therapist, who obtained an admission history from plaintiff before a scheduled psychiatric evaluation.

10

Huebsch noted that on February 19, 2010, plaintiff had made an inappropriate 911 call that prompted emergency services; when law enforcement came to his home, plaintiff ran but was caught and brought back to his residence.  Law enforcement noted that plaintiff was not suicidal, but was not making rational sense.  He was brought to mental health intake for services, where the intake worker noted that plaintiff was largely incoherent, communicating delusional and somewhat paranoid ideas about the government and the social security system.  Huebsch had been called to assist with de-escalating plaintiff and succeeded in convincing him to complete intake paperwork.

During the interview with Huebsch on March 30, plaintiff stated that he had a final disability hearing coming up and that if his application was not approved, he feared he would become homeless because his family would no longer be able to support him. Huebsch noted that plaintiff stated "with a tone of hostility that he cannot work, and that Social Security has to accept this and get over it." AR 497.  Plaintiff attributed his inability to work to a learning disability.  Although plaintiff had denied having any mental health issues when he was brought to the intake department in February, he told Huebsch that in addition to the learning disability, he had severe debilitating clinical depression, obsessive-compulsive disorder and active psychosis.  When asked about the onset and development of his symptoms, plaintiff described "an elaborate constructed reality around being severely persecuted as a homosexual throughout his school age years in Luck, Wisconsin," and expressed his belief that America is a homosexual concentration camp, where men are forced to take a wife or perish.  Plaintiff stated that he had been prescribed sertraline and

11

paroxetine by Dr. Wilhelm, but that he was not taking them because they made him lethargic and because he was concerned about reported side effects such as weight gain and "borderline chemical castration."  He had not participated in outpatient mental health services because he had no insurance.  He denied use of alcohol or controlled substances. He told Huebsch that Adderall and diazepam were effective medications for him that allowed him periods of functionality and relief from his chronic and debilitating depression.

Regarding his educational history, plaintiff said that although he was given a high school diploma, he had a severe learning disability.  According to plaintiff, his special education teacher did the tests for him so that he could pass in order for the school to get funds from the government.  With respect to occupational history, plaintiff said his last significant employment was in 2003-2004 as a corrections officer.

Plaintiff said he had severe clinical depression and that he spent most of his time lying in bed drooling.  He also said he had severe anxiety including obsessive repetitive thoughts and compulsive cleaning behaviors such as hand-washing up to 1,000 times a day.  In addition, he described active psychosis, including visual and auditory hallucinations. Plaintiff attributed all of his symptoms to being a victim of persecution around "an elaborately constructed reality involving homosexual concentration camps, use of technology, language, and geometry."  AR 499.  When Huebsch pointed out that most people would consider plaintiff's ideas delusional, plaintiff replied that mainstream society would not understand these things because of an elaborate cover-up, but that he believed them to be absolutely true and not delusional.

12

On mental status evaluation, Huebsch observed that plaintiff was oriented to person, place and time, appropriately dressed and groomed and was calm and respectful throughout the interview. Motor activity and speech were normal and his affect was generally bright and well-regulated. He showed no verbal or nonverbal indication of agitation or distress in participating in the interview process except for being upset about the possibility that Social Security would deny his disability claim. His thought process showed features of delusional ideation of persecution, was irrational and had psychotic features, but showed a high degree of complexity. He often appeared internally distracted, but reasonable in his ability to track and understand interview questions.

Huebsch diagnosed psychotic disorder, not otherwise specified, with themes of persecution and a reported history of mood and anxiety disorders and a learning disability. He assessed plaintiff's current Global Assessment of Functioning (GAF) score as 36. Huebsch wrote:

> It was difficult to assess the validity of the client's reported mental health symptoms based on his mental state and the incentive for secondary gain for malingering to favor his upcoming Social Security hearing. The client apparently has a history of depression and was prescribed medication for this condition. He was not inclined to sign releases of information for the clinic to request medical records to verify the clinical impressions of previous providers. The client also appears to have underlying anxiety and active delusions, yet his cluster of reported symptoms appear somewhat atypical. Ironically the ideas outlined above about persecution of homosexuals that the client asserts to be true and accurate, are the very ones that give the impression of genuine delusions. The clinical profile will need to be clarified over time though [sic] his psychiatric evaluation and ideally through psychological testing. The client is guarded about participating in a psychological evaluation, as this service is not covered by his insurance. As noted, it was communicated to the client that the clinic would work with him to assure that a sliding fee, payment plan or waiver of fees would be worked

13

out to assure he received any necessary services.

AR 499.

On April 14, 2010, J. Scott Persing, M.D., a consulting psychiatrist with the St. Croix Department of Health and Human Services, wrote a one-page letter in support of plaintiff's upcoming disability hearing. AR 503. Persing said that he "had the opportunity to meet with [plaintiff] for a total of 20 minutes on this date," during which plaintiff had described his problems in finding an attorney to represent him at his upcoming disability hearing and in obtaining further assessment and treatment for his ongoing psychiatric concerns. Plaintiff told Persing that he had not worked since 2004, and described himself as "hitting a wall" with respect to overcoming his symptoms. In Persing's opinion, plaintiff would not be able to maintain gainful employment for at least the next 12 months.

On April 22, 2010, plaintiff returned to see Dr. Persing for a psychiatric evaluation. Plaintiff was accompanied by his father. Plaintiff said he began having major mental health problems several years earlier when he was no longer able to work, although it was unclear to Persing exactly what type of symptoms plaintiff had at that time. Plaintiff reported a variety of current symptoms including paranoia, mania, depression and extreme anxiety and said he had OCD. He had tried sertraline and paxil but did not find them to be of much benefit; he told Persing that he had at some point taken Adderall or diazepam and felt that those medications had helped. After conducting a mental status evaluation, Persing found plaintiff to be oriented and alert with fair eye contact and speech that was a bit rapid and tangential. His mood was somewhat depressed and affect quite labile and he had mildly

14

increased psychomotor activity in the form of fidgeting.  He had no suicidal or homicidal thoughts and no ongoing delusions.  Insight and judgment were poor.  Dr. Persing diagnosed anxiety disorder, not otherwise specified, psychotic disorder, not otherwise specified, and assigned plaintiff a GAF score of 40.  He prescribed Luvox to help with excessive thinking and anxiety.  AR 501-02.

Dr. Persing saw plaintiff again on May 20, 2010.  Plaintiff reported that Luvox had made him excessively sleepy, with increased appetite and nausea.  Dr. Persing added a prescription for .5 mgs Klonopin, a drug in the same family as Valium.

On July 22, 2010, plaintiff arrived 10 minutes late for a 20-minute appointment with Dr. Persing.  Persing reported that plaintiff used most of the time to vent his frustration with the medical system, lack of disability income, expense of medications and having to pay out of pocket for his appointments.  Plaintiff said he had been taking the medications that Persing had prescribed without side effects but did not find them helpful.  When Persing attempted to discuss medications and treatment alternatives, plaintiff became extremely agitated and left the appointment.

Plaintiff never scheduled any followup appointments with Dr. Persing.  Summarizing plaintiff's case in his closing note dated March 16, 2011, Persing wrote that plaintiff was extremely leery of medications; he had initially taken Luvox reluctantly for anxiety but refused any antipsychotic type medication.  Plaintiff was, however, "definitely wanting to try treatment with either Adderall or Valium" and eventually low dose Klonopin had been prescribed.  Nonetheless, at plaintiff's last appointment on July 22, 2010, he had become

"rather agitated and upset, as he was not provided psycho stimulants." AR 489. Persing wrote that plaintiff's remaining problems were breakthrough psychosis and medication seeking.

b.  St. Croix Regional Medical Center

On May 23, 2011, plaintiff came to the emergency room with complaints of insomnia and a panic attack. He was seen by Bridget McGill, D.O., who recommended various techniques that would help plaintiff get more sleep at night. Although plaintiff listened, he did not seem to think that McGill's suggestions would help and he asked to be put on psychiatric medications. When McGill explained that such medications were not available through the emergency room and that plaintiff would have to set up an appointment with a doctor in the clinic, plaintiff and his father "became quite irate at the idea and their calm and interested demure [sic] became angry." AR 508. Dr. Thomas Hinck became involved and noted that plaintiff's father was more upset than plaintiff; plaintiff seemed calm and in no acute distress. Plaintiff told Hinck that he was having asthma symptoms that were making him anxious and recognized that his continued smoking was probably aggravating his symptoms. Hinck prescribed .5 mg Ativan with no refills and an albuterol inhaler and encouraged plaintiff to schedule a followup appointment in the clinic. AR 509.

C.  Other Evidence

On function reports submitted in connection with his application, both plaintiff and his father reported that plaintiff had no problems with personal care and was able to perform a variety of daily tasks independently, such as grocery shopping, driving, making meals, taking care of pets, performing household chores and yard work.  In addition, both reported that plaintiff was able to pay bills, count change, handle a savings account and use a checkbook, had no problems getting along with others, could pay attention as needed, followed spoken and written instructions well and had no physical limitations.  AR 181-97.

Plaintiff's school records showed that he participated in the "Resource Room" while in junior high and received some D's in the fifth and sixth grade, but contained no evidence suggesting that he was determined to have a learning disability or that he required more than tutoring services.  His grades in 11th grade were primarily A's and B's.

D.  Administrative Hearing

On March 5, 2013, plaintiff appeared before administrative law judge Teresa Haskins-Hart, who presided via videoconference from the San Jose hearing office.  Plaintiff was represented by counsel, who informed the administrative law judge that he had reviewed the record and that it was complete.  Counsel also stated that he had no witnesses to call besides plaintiff.

17

1.  Testimony of Dr. Robert McDevitt

The administrative law judge called Dr. Robert McDevitt, a board certified psychiatrist, to testify as an impartial medical expert. McDevitt stated that he had reviewed plaintiff's medical evidence, including the 2006 report from Colorado West, King's evaluation, Persing's reports and Huebsch's evaluation. Testifying at some length, McDevitt indicated that although there was a "strong indication" that plaintiff was suffering from some kind of mental illness, there was little evidence in the record from which to evaluate its nature, severity or duration. He noted that plaintiff had not accepted psychiatric treatment, his mental status was relatively good even though he presented as delusional and there were "major questions" whether plaintiff actually had a mental impairment or was chronically dysfunctional either from a personality disorder, drug abuse or something else. AR 341-44. McDevitt added that plaintiff was probably more functional in terms of his activities of daily living, social functioning and concentration, persistence and pace than he suggested to his doctors. AR 350-51. In McDevitt's opinion, the 2010 records from Dr. Persing and Huebsch were the strongest records demonstrating a severe, continuous mental impairment, but even those were inconclusive given Persing's closing note, which indicated that he had reservations about his initial opinion in light of plaintiff's failure to follow through with prescribed treatment and his medication-seeking behavior. According to McDevitt, at most, Persing's notes showed that from time to time, plaintiff might have psychosis, but whether it was continuous or whether it prevented him from performing simple, repetitive work was not clear.

Ultimately, Dr. McDevitt determined that the medical evidence in the record was insufficient to allow him to conclude that plaintiff had a severe mental impairment that met the 12-month durational requirement.  Therefore, he did not express an opinion regarding plaintiff's work-related limitations.   McDevitt suggested that a consultative examination with a psychiatrist or psychologist specifically focused on projective testing (for example, the Rorschach Inkblot test) might shed more light on plaintiff's impairment.

## 2.  Testimony of plaintiff

Plaintiff testified that he had worked a variety of short-term jobs in the late 1990s. In approximately 2000, he obtained his commercial driver's license and got a job as an over-the-road trucker, although he did not keep the job for very long.  He testified that he no longer held a commercial driver's license because it had expired.  He had had a regular driver's license since he was 16 years old, except for a 12-month suspension in 2003 for refusal to submit to a breathalyzer test.  His longest period of employment was from 2003-2004, when he worked as a correctional officer in a maximum security prison in Arizona.

Plaintiff lived in a rented house with his father and one of his brothers.  When asked how he spent a typical day, plaintiff replied that a typical day is "with no money, with no financial ability to do anything whatsoever."  AR 376.  He drove a car to the grocery to purchase food with food stamps.  When asked why he could not work, he replied:  "My medical condition prevents me from maintaining significant employment.  I'm unable to maintain employment due to my severe debilitating medical condition."  AR 376-77.  When

his lawyer asked whether he suffered hallucinations or delusions, plaintiff replied that he was not a doctor. AR 377. Plaintiff testified that he was unable to obtain healthcare because he had no ability to pay, noting that his BadgerCare had been cancelled because he could not afford the $60 to pay for it. AR 378.

3. Testimony of Michael Guckenberg

Michael Guckenberg testified as a vocational expert. In response to a hypothetical question by the administrative law judge, he testified that a person of plaintiff's age and education who was limited to unskilled work that involved no more than routine interactions with others could perform the jobs of dishwasher/ kitchen helper, assembler and vehicle cleaner, and that there were thousands of these jobs in regional and national economy. He also testified that if the worker had symptoms that interfered with concentration and attention such that he was off task up to five percent of the work day, he would still be able to perform the jobs, but that there was no work available for someone who was off task up to 15 percent of the day. AR 383-84.

D. ALJ Decision

The administrative law judge issued a written decision on May 17, 2013, denying plaintiff's claim for benefits. AR 289. Applying the five-step process for evaluating disability claims, 20 C.F.R. §§ 404.1520 and 416.920, the administrative law judge found that 1) plaintiff had not engaged in substantial gainful activity since his alleged onset date of April

20

1, 2004; 2) plaintiff had a combination of impairments (anxiety disorder, not otherwise specified, history of polysubstance abuse, history of psychotic disorder, NOS, and history of learning disorder) that was severe; 3) plaintiff's impairments were not severe enough to meet or medically equal the criteria of any "listed" impairment; 4) plaintiff was unable to perform his past relevant work as a corrections officer; and 5) there were jobs existing in the regional and national economy that plaintiff could perform in spite of his limitations, including dishwasher, assembler and vehicle cleaner.

In arriving at her conclusions, the administrative law judge relied heavily on the testimony of Dr. McDevitt and the consultative report of King, neither of whom could find from the record that plaintiff had a severe, disabling mental condition that would persist for 12 months. Acknowledging the possibility that a further consultative examination focused specifically on projective testing might shed more light on the nature and extent of plaintiff's condition, the administrative law judge nonetheless determined that further development of the record was not warranted because the burden of proof was on the plaintiff, the agency had developed the record by seeking a consultative examination and obtaining treatment records and plaintiff had not cooperated with the agency by refusing to sign releases to obtain medical records that already might have existed. As for plaintiff's allegation of a severe learning disability, the administrative law judge pointed out that plaintiff's school records failed to corroborate that assertion, plaintiff was able to obtain a commercial driving license and attend correctional officer training and that plaintiff's father had reported to Dr. Stratton that plaintiff had no history of developmental or learning disabilities.

21

The administrative law judge further noted that, according to plaintiff's function report and his statements to King, the consultative examiner, he had no limitations apart from a learning disability in math, and that Dr. McDevitt suspected that plaintiff's functioning was higher than he presented to his doctors.  She also noted that there were a number of reasons to question the credibility of his claim of total disability, namely, his contradictory statements regarding drug and alcohol use, the long gaps in treatment, his failure to take the medications prescribed by his doctors, his repeated requests for Adderall and Valium and his failure to sign medical releases when contacted by the disability agency.

The administrative law judge gave little weight to Dr. Persing's April 14, 2010 statement that plaintiff was disabled.  She explained that Persing's opinion was based only on a brief, 20-minute initial evaluation of plaintiff, was not supported by any objective clinical diagnostic findings, did not indicate that plaintiff's disability would continue for more than 12 months and was inconsistent with his closing note dated March 17, 2011, which suggested that he was reevaluating his initial impression based upon plaintiff's medicine-seeking behavior.

In spite of the failure of both Dr. McDevitt and King to find evidence of a severe mental impairment that could be expected to last 12 months, the administrative law judge found that, in combination, plaintiff's diagnosed conditions and history of a learning disorder would pose more than minimal functional limitations on his ability to work, in other words, that it was severe.  She found, however, that the conditions would not prevent plaintiff from performing unskilled work that did not require more than routine contact with

22

others.  Relying on the testimony of the vocational expert, the administrative law judge concluded that there were thousands of jobs that fit this description and that therefore, plaintiff was not disabled.


OPINION

In reviewing a decision by the commissioner that a claimant is not disabled, this court does not consider the case anew, resolve factual disputes or reweigh the evidence.  Scott v. Barnhart, 297 F.3d 589, 593 (7th Cir. 2002).  Its review is limited to determining whether the commissioner's decision is supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept to support such a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1972).  This court also considers whether the administrative law judge committed errors of law.  Sims v. Barnhart, 309 F.3d 424, 428 (7th Cir. 2002).

Applying these principles to this case, I am satisfied that the administrative law judge's decision is supported by substantial evidence and free of harmful legal error.  As an initial matter, plaintiff does not challenge any specific parts of the administrative law judge's decision.  He complains only that there was no heat in the hearing room and that the administrative law judge was "intolerant" of his presence, discriminated against him and would not allow him to communicate with his lawyer.  Br. in Support, dkt. #11.  None of these allegations is supported by the record.  The record indicates that the hearing reporter turned up the heat at plaintiff's request.  Further, the hearing transcript lends no support to

23

plaintiff's assertion that the administrative law judge treated him unfairly.  To the contrary, she asked him a number of pertinent questions about his work history and daily activities, addressed him respectfully and allowed his lawyer to follow up with his own questions.

In his reply, plaintiff suggests that the administrative law judge should have found him disabled on the basis of Dr. Persing's April 14, 2010 statement.  Under the regulations governing social security claims, more weight is presumptively given to opinions from treating sources, 20 C.F.R. §§ 404.1527, 416.927, and Persing qualifies as a treating source.  However, because bias in treating sources is not uncommon, an administrative law judge need give controlling weight to such an opinion only if it is well-supported and not inconsistent with other substantial evidence in the record.  Hofslien v. Barnhart, 439 F.3d 375, 377 (7th Cir. 2006); White v. Barnhart, 415 F.3d 654, 659 (7th Cir. 2005).  When rejecting an opinion from a treating source, the administrative law judge needs to provide "good reasons."  20 C.F.R. §§ 404.1527(c), 416.927(c).

Here, the administrative law judge explained why she was giving Dr. Persing's opinion little weight:  it was formed after meeting plaintiff for only 20 minutes, it was unsupported by any objective clinical findings, Persing had opined that plaintiff was unable to work for 12 months but did not indicate that the disability would continue and his opinion was inconsistent with his case closing note, which indicated that he was reevaluating his opinion in light of plaintiff's medicine-seeking behavior.  Each of these was a good reason for rejecting the opinion.  Not only was Persing's quickly-formulated opinion lacking in any clinical, objective support, but it was inconsistent with his later observations, which

24

suggested that plaintiff might have had ulterior motives for seeking psychiatric care. Moreover, Persing's opinion was inconsistent with King's evaluation, which detected no disabling mental symptoms, and with McDevitt's conclusion that there were simply too many questions about the nature and severity of plaintiff's condition to be able to declare him disabled from a mental impairment. All of this contradictory evidence was sufficient to support the administrative law judge's decision to reject Persing's April 14, 2010 opinion.

Although plaintiff does not identify any other alleged errors in the administrative law judge's decision, for the sake of completeness I have reviewed the record in its entirety and find none. The administrative law judge discussed all of the evidence at length and cited good reasons for rejecting plaintiff's claim of total disability, including his long gaps in treatment, failure to grant access to his medical records or comply with treatment recommendations, medicine-seeking behavior, contradictory statements regarding drug and alcohol use, lack of reported limitations on his function reports and at the consultative examination and the opinions of King, McDevitt and the state agency consultants. Further, she acted within her discretion in deciding that another consultative evaluation was not necessary in order to decide plaintiff's claim. Nelms v. Astrue, 553 F.3d 1093, 1098 (7th Cir. 2009) (although administrative law judge has duty to develop full and fair record, how much evidence to gather is generally left to the commissioner's reasoned judgment). As the administrative law judge pointed out, the disability agency had already sent plaintiff out for one evaluation and had obtained his treatment records; further, there was reason to question whether plaintiff would cooperate even if another evaluation was ordered given his

reluctance to sign medical releases and comply with treatment recommendations. "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand," Binion v. Shalala, 13 F.3d 243, 246 (7th Cir. 1994), and that is all that is present here. Accordingly, there is no reason to remand this case for the purpose of an additional consultative evaluation.

Finally, I have considered whether the administrative law judge erred in failing to incorporate limitations in concentration, persistence and pace into the residual functional capacity assessment. The administrative law judge determined that plaintiff had "moderate" limitations in this area, but it is unclear how she accounted for this in her residual functional capacity assessment or hypothetical question to the vocational expert. That may have been a mistake. E.g., O'Connor–Spinner v. Astrue, 627 F.3d 614, 620 (7th Cir. 2010) ("[E]mploying terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the [vocational expert's] consideration those positions that present significant problems of concentration, persistence and pace"); Craft v. Astrue, 539 F.3d 668, 677–78 (7th Cir. 2008) (restricting hypothetical to unskilled work did not consider plaintiff's difficulties with memory, concentration or mood swings). I am convinced, however, that the mistake was a harmless one. Notably, in finding that plaintiff had moderate limitations in concentration, persistence or pace, the administrative law judge did not cite any clinical findings or medical opinions; in fact, there is little in her decision to support a finding that plaintiff has any limitation at all in this area. Neither King nor the two medical consultants who evaluated the record found that plaintiff would have more than mild functional limitations and

plaintiff has not alleged or identified evidence of any significant concentration or persistence problems.  So far as it appears, the administrative law judge went out of her way and ignored the medical evidence when she found "moderate" instead of "mild" limitations in concentration, persistence and pace. That being so, there is no reason to remand this case because there is no reason to suspect that the result after remand would be any different.


ORDER

IT IS ORDERED that the May 17, 2013 decision of the Commissioner of Social Security denying plaintiff Shane Hall's application for disability insurance and social security income is AFFIRMED.  The clerk of court is directed to enter judgment in favor of defendant and close this case.


Entered this 20th day of January, 2016.

BY THE COURT:

/s/

BARBARA B. CRABB
District Judge